UNITED STATES, Appellee

v

LEROY WASHINGTON, Specialist Third Class, U. S. Army, Appellant

9 USCMA 131, 25 CMR 393

No. 10,086

Decided April 11, 1958

*First Lieutenant Neil Flanagin* argued the cause for Appellant, Accused. With him on the brief was *Major Frank C. Stetson.*

*Major Thomas J. Nichols* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee* and *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused issued a number of worthless checks. An investigation of the surrounding circumstances was made by a military police investigator. The accused gave the investigator a statement in which he said, in part, that he had opened a savings account with a named bank in New York City and that at the time of the interview he had on deposit about $1100. Later, the statement was made the basis of a charge of making a false official statement, in violation of Article 107, Uniform Code of Military Justice, 10 USC § 907. The charge was referred to trial, along with others alleging larceny by check, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. The accused was convicted as charged and the conviction was affirmed, with some modification.

Two questions are raised on this appeal. The first is whether a pretrial statement made by the accused to his acting company commander is admissible in evidence. We all agree that a

statement is inadmissible, despite advice to the accused of his rights under Article 31 of the Uniform Code, 10 USC § 831, if the accused is informed at the time of the advice by a competent person that whatever he says will be held in confidence between them. A representation of that nature tends to induce a belief in the mind of the accused that his disclosure will *not* be made the basis for a criminal prosecution. See United States v Cudd, 6 USCMA 630, 20 CMR 346. In my opinion, there is sufficient evidence to support a finding by the law officer that the representation of confidentiality in this case was simply to the effect that the accused's statement would not be publicized in the company area. However, my brothers are of the opinion that the evidence conclusively shows a representation of absolute confidentiality among the accused, the acting commander, and certain other persons. Under their view therefore, it was prejudicial error for the law officer to admit the accused's pretrial statement into evidence.

The second issue is whether the accused's statement to the military police investigator constitutes a false official statement within the meaning of Article 107 of the Uniform Code. In United States v Aronson, 8 USCMA 525, 25 CMR 29, the Court held that a statement of the kind in question was not within the scope of the Article. That case controls the situation here.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and specification 2 of Charge I is ordered dismissed. A rehearing may be had on the other charges.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

The accused had negotiated several checks which were returned for insufficient funds on deposit with the drawee bank. Subsequently, his acting company commander, having been notified of

this fact, called him in to discuss the matter and advised him generally of his rights under Article 31 of the Code, 10 USC § 831. However, the acting commander then went on to add that anything said by the accused would be kept in confidence between those persons present in the room and possibly the accused's company commander when he returned. Thereupon, the accused made the statement which was the basis for the false official statement alleged in the first specification. When the prosecution offered the statement in evidence, defense counsel objected upon the ground that it was obtained contrary to law.

In United States v Cudd, 6 USCMA 630, 634, 20 CMR 346, this Court had occasion to pass on a question almost identical to that here presented. In that case, the investigating officer during an interview told the accused that anything said by him would be kept in confidence. While the following statement was an expression of my view, I believe the concept announced is apropos in the case at bar:

"To make my position certain, I inveigh forcefully against the practice of having a Government agent who is conducting an official investigation warn an accused person that any statement he makes can be used against him in a court-martial and then destroy the effect of that statement by a subsequent declaration that any statement made will be considered secret. For all practical purposes, that amounts to no warning, as the assurance could only be interpreted to mean that the statement would not be used in a subsequent trial."

In this particular instance, the person giving the warning and then stating in substance that the evidence would be retained in confidence was the commanding officer of the accused. He occupied a position of responsibility where his assurance could be given credence by the accused, and the overall effect of the promise created in the mind of the accused a belief that his disclosures would not be made the basis for a prosecution. Certainly, when a

commanding officer lures a member of his command into believing that the subjects discussed will be treated in confidence, the very basis of Article 31 is destroyed. That Article specifically provides that one suspected of an offense must be informed that any statement made by him may be used as testimony in a court-martial and a statement by one in authority that a conversation will remain confidential between the parties neutralizes any warning previously given. As a matter of fact, in this instance, the officer confessed that he promised confidentiality to get the accused to talk more freely. Tactics such as those are contrary to law and do not meet the approval of this Court.

The Government seeks to avoid the effect of the officer's conduct by contending that he made other statements from which the accused should have ascertained that the testimony could be used against him. I am not convinced by these arguments for the reason that the record indicates the officer himself was uncertain as to whether he had breached the confidential relationship he had created. Certainly, if he was confused, I find no reason to assume the accused understood fully his right to refuse to answer. The following testimony from the record is informative in that regard:

"Q. Now tell us what you told him.
"A. First I asked him if he understood his rights under the 31st article and he said he did and I told him that he was not required to make any statements whatsoever, that anything I question you about could be used by a court-martial against you should a situation such as that arise. I reminded him of the fact that if he did make statements they could be used against him. I also explained to him that anything he did say was between he and I and anything said was to be between us and any witness who might be in the room at the time.
"Q. You are breaching that relation, are you not?
"A. I may be, I told him—
"Q. You told him whatever he told you was confidential?

134

"A. That's right between he and I[ and the witness."

While other testimony tending to explain the reason for promising secrecy was elicited from the officer, I am convinced that the accused was not accorded the privilege of being advised intelligently on his rights.

Having found error, that is only the beginning of the inquiry and not the end, for it is contended by the Government that action by subsequent reviewing authorities purged any possible prejudice. The testimony erroneously admitted was the foundation for the offense of making a false official statement alleged in the first specification of Charge I. The convening authority, upon advice of his staff judge advocate, reversed the finding on that offense for insufficiency of the evidence, dismissed the specification, and reduced the sentence of confinement from two years to one year. It might be that under certain circumstances the Government's contention could be valid but, in this instance, all of the offenses grow out of a course of conduct that extended over a rather short period of time, and they are so interwoven that finding prejudice on one alone would require us to make an assumption contrary to a record which speaks otherwise.

The accused became a witness in his own defense and testified to most of the transactions, but he at all times firmly insisted on a lack of criminal intent. He was found guilty of two offenses of giving a false statement and five offenses of larceny, and the curative action on one conviction was taken after trial. As I interpret his testimony at trial, his defense was principally that he wrote the checks and made the statements because he honestly believed he had funds on deposit to pay the checks when presented. The statement to his commanding officer and the subsequent statement to the investigator were similar in content, for both mentioned a bank and a deposit and, under any reasonable interpretation, the court-martial members would be led to believe that in both instances he was talking about the identical depository and the same fund.

Each statement was inconsistent with the other, and their inconsistencies would tend to prove the accused was not disclosing the true facts. Moreover, proof that he falsified to his commander would reflect on his veracity and credibility and thus weaken all of his testimony in defense of what was essentially a series of related offenses. Obviously, if the inadmissible testimony created the impression that he lied about one incident in the chain of events, the court-martial would not pause to isolate one offense from the others. On the contrary, the natural reaction would be to destroy the accused as a reliable witness because a proven prevaricator on one charge would be considered as unworthy of belief on all. Certainly, when erroneously admitted evidence tends to prove an accused has committed an offense akin to perjury, its impact can seldom be limited to his testimony on one of several charges and, under the peculiar facts of this case, I am certain the questionable testimony undercut the defense accused was advancing on the remaining specifications. I, therefore, find prejudicial error which was not cured by the dismissal of the one charge.

The next issue involves the question of whether the false statement made by the accused, as alleged in the remaining specification, was official. The facts relevant to that issue are these. Because accused's activities in writing worthless checks had been called to the attention of military authorities and his military commander was required to make some disposition of the complaints, an official investigation was ordered. Approximately one week after his interview with his acting commander, the accused was interviewed by a military police investigator. He was notified of the identity of the investigating officer, informed of the purpose and nature of the investigation, and warned of his right not to make any statement. He was then asked if he cared to make a statement, and he elected to do so. There is no contention that he was not fairly warned of his rights or that he did not understand his privilege to remain silent. In spite of the warning, he chose to give a written statement which was intended to be exculpatory. In that statement, he asserted inter alia that about two years prior to the investigation he had opened a savings account with the Manufacturers Trust Company in New York City and, at the time of the interview, he had a balance of approximately $1,100 in that account. The record shows the materiality of the statement, its falsity, accused's knowledge that it was untrue, and all other essential elements of the crime.

By relying on certain language that was not necessary to a decision, my associates cite United States v Aronson, 8 USCMA 525, 25 CMR 29, as authority to reverse this case. I disagree, for if that case was decided rightly because the interrogation was official, then this conviction should be affirmed. In that connection, it is worthy of note that paragraph 186, Manual for Courts-Martial, United States, 1951, furnishes the perfectly sound principle that an official statement is one made in the line of duty. It then goes on to state that a statement is made in line of duty and is official when given to a person authorized in the execution of his duty to require a statement. Article 30 of the Code, 10 USC § 830, and other provisions of the Manual which are relevant to this inquiry show beyond question that the investigator was authorized in the performance of his duties to interrogate the accused. The Code, in subsection (b) of Article 30, supra, has this to say:

> "Upon the preferring of charges, the proper authority shall take immediate steps to determine what disposition should be made thereof in the interest of justice and discipline, and the person accused shall be informed of the charges against him as soon as practicable."

The proper authority in this instance was the company commander and, pursuant to the duties placed upon him by the quoted section, he was required to take immediate steps to investigate, determine the proper disposition of the

charges, and inform the accused of the charge.

The principal purpose of crime detection and enforcement is to aid the military authorities in maintaining discipline and order. Performance of duties in support of those objectives is a function of military government, and the preliminary inquiries required by the Code are just as much official as are the subsequent trials. To hold otherwise is to make a farce out of a preliminary judicial investigation required by the Code, for if all witnesses may lie with impunity because there is no officiality to the proceedings, they become individualized ventures which are worthless to the administration of military justice.

It matters not whether the person interrogated is the accused or a third party, for in either event the purpose is to determine the future disposition of an alleged offense. The inquiry may aid the accused or it may assist the Government, but its ultimate objective is proper administration of military law. Furthermore, each person interviewed is protected from furnishing incriminating evidence, for he is advised of his rights under Article 31, and if the one suspected of an offense does not care to cooperate, he is entitled to that privilege. But once he waives his right not to speak, he is obligated not to falsify. As I view the situation, this proceeding is a small brother to a trial on the merits, and truthful answers must be given in both instances if the person interrogated elects to make a statement. In the present case, the accused well understood his rights under the Article and, while he could have remained silent, he chose to make a statement which was false.

The argument set out in *United States v Aronson*, supra, that a statement, however false, is hardly calculated to pervert the function of an investigative agency and that the only effect of a statement received from a suspect is to stimulate the agency to carry out its function, misses entirely the purpose Congress had in mind when it required the investigation of offenses. I thought a person might escape

**136**

prosecution if he could raise a doubt in the minds of those in the chain of command that the charges were well founded. Had the story told by this accused been checked and found to be true, his case would not have reached judicial channels. No commander worth his commission wants to prefer charges against an innocent member of his command, and Congress, in Article 30 of the Code, took pains to prevent that contingency from happening. That Article provides that charges should be sworn to only if certain conditions existed. They are as follows: (1) That the signer has personal knowledge of the facts; (2) that he has investigated the charges; or (3) that the same are true in fact to the best of affiant's knowledge or belief. The commanding officer here concerned was afforded the benefit of an investigation, but that method of ascertaining the true facts is now held to be outside the bounds of officiality. Overlooked in that holding, however, is the duty imposed by the law on appropriate commanders to ascertain fully all of the facts before acting on charges. That is a protection afforded an accused, and I believe officers would be derelict in their duties if they did not permit those suspected of committing crimes to give their versions of the transactions, for they ought to be heard before a decision to prosecute is made. However, if an accused desires to aid his cause by making any statement, he should not be permitted to mislead military officials who are rightfully performing their duties. To do so is to pervert a proceeding which is necessarily a part of military justice.

When consideration is given to the right of the immediate commander to prefer charges, to refrain from preferring them, to dismiss those offenses which have been charged, or to impose Article 15 punishment, it ought to be apparent to even the casual observer that interrogations which may influence the action to be taken are steeped in officiality. But the tragedy in this holding is that investigations will become empty rituals if those who are interrogated may lie with impunity. If accused has that license, so do other

persons who are interrogated. When that condition is reached, an intelligent decision by appropriate commanders will be more difficult of realization, and in the long run today's decision may work to the disadvantage of one suspected of an offense. I would, therefore, hold that accused's false statement was official.